Okay, we'll call our next case, Carter v. Philadelphia. Please proceed. Good morning, Your Honors. May it please the Court, my name is Lisa Eldridge. I'm of the law firm of Clark Hill, and I'm representing the appellant, cross-appellee, City of Philadelphia in this action. Are you reserving time? Do I have time for rebuttal and to respond to the cross-appeal of plaintiffs? Done. Thank you. The City of Philadelphia seeks a reversal of the District Court's grant of summary judgment in favor of plaintiffs, because the District Court erred when it determined that plaintiffs were entitled to overtime pay for work performed from home. We are so familiar. Go ahead. So, in your opening brief, you say this case should be remanded for further proceedings, as there are clearly issues of material fact and dispute. And then the brief, I think, might not have been as clear. So I'd love you to tell us, what do you think is the most important one or two critical, genuine disputes that make clear that this case should be remanded? I think the primary disputes are on the record about whether the plaintiffs were learned professionals and what facts were, that there were facts in dispute in terms of the level of services they were performing, in terms of the quality of the knowledge needed there. In terms of their educational background, in terms of requiring a master's degree, there was a lot of emphasis placed in the facts about training on the job, which of course was part of it. But their degree in terms of social work, mental health counseling, psychology, was an important part. So one of the things that was mentioned in the record was the master's degree. In the job description, it says master's degree. But there's also an alternative, which just says your education and experience. So at least from the record, it seemed that it wasn't a strict master's degree requirement. You'd agree with that, right? That is correct, Your Honor. And that's part of what you think are the genuine disputes that make summary judgment inappropriate. Yes, that's correct. In answering that, where there is a master's degree requirement, what, if any, academic areas does that requirement pertain to? If you say there's a master's in accountancy, I assume that would not count. That's correct. What is it spelled out clearly? Master's degrees have to be in certain areas, and what are those areas? Yes, those areas are psychology, sociology, mental health counseling, or social work, or something in those areas. I think there is some flexibility in terms of when people are being hired. And the master's degree requirement is for the past approximately 10 years. Prior to that, it was a bachelor's degree also in those areas. And so some of the coordinators and plaintiffs have been with the city for quite some time and have come up through the ranks and don't have a master's because they came in prior to that requirement. There's also a civil service exam they have to take, right? Correct. But is that specific to their job, or is that just a general civil service exam that any city employee's got to take? Your Honor, I don't recall there being information on that in the record. I don't believe that that is focused on this. I don't think that it is a... That's correct. The idea is I think what plaintiffs are trying to say is they answer the phone, this is very rote, anyone can do this job. You know, they have a manual they can look at, and if it checks off the boxes. But these are people, this is a crisis hotline, so it's both petitions for people calling to see if a crisis team can come out for an involuntary psychiatric evaluation and commitment request, and then there's also two hotlines that are suicide hotlines and crisis hotlines. And so the people that are operating in these, I think, you know, need to... They have discretion, judgment about what needs to be done, what services need to be provided, whether they qualify. Right. We've read the papers on that. I will say it is, I'll be asking Mr. Trubman about this at the appropriate time, but it is remarkable how money works as a powerful incentive. Because the prospect of overtime has got these employees saying, you know, yeah, anybody could do this job. It's not quite to the point of saying Mr. Ed could do this job, but it's just... Anybody could do this job. I thought that was funny. I'm of that generation, Your Honor. But it's a very interesting to hear them denigrate their own qualifications, the sophistication of the work that they do, and their weight of their own responsibility. But that's the world we live in when it comes to LSA cases and when an exemption is at issue. So we know your effort to say, oh, no, no, they're very sophisticated, and these are highly responsible jobs, and understand where they're coming from and the reasons they're saying the things they're saying. But what I'm curious about is Judge Greenaway's question. If you were going to say this fact issue, here it is in the record, and this is what Judge Joyner missed. He didn't even address it. What would that be? What's the thing he didn't talk about or that he treated so superficially that his summary judgment opinion shouldn't be given an affirmance? I think where Judge Joyner focused is he seemed to focus quite a bit on the fact that it was on-the-job training versus their educational background that was important for the job. And what we contend, the city contends, is it's a combination. Of course there's on-the-job training. Just like there is for being a lawyer, there's on-the-job training. But that does not take away from the fact that their educational background and their history that was required in terms of mental health or psychological counseling is not also something they are bringing to the table. It's a skill set. This is all about on the professional exemption. And you've pushed on the administrative exemption, too, and then raised a hybrid theory. Did you bring that hybrid theory in front of the district court? So the hybrid theory, Your Honor, no, was not mentioned specifically. Well, then why should we be thinking about it here? We believe the court has discretion to hear it. Both the exemptions were put before the district court and argued. There was no tacking. Tacking was not mentioned in the district court. You never said you can take one from column A and one from column B and put things together. So I'll repeat. In rare circumstances, we do address a theory that wasn't put to the district court. But this was a legal theory that was just never presented to Judge Joyner, right? It was not specifically presented. Well, Your Honor, it was not tacking was not presented. However, the case on some of the cases that we have says that you don't need an incantation of particular words. Both these exemptions were before the court. Yes, we did not make there was not an argument made by the city at that time that they could be combined. But we believe that it was both exemptions were argued extensively. Now explain, because I didn't understand, frankly, the administrative exemptions application with, I guess I had a hard time understanding what the business of the unit is, right? I mean, you've got to make a pitch about what the business of the unit is. What's the what's the business of the unit or the department? I like the business of the unit, but I'm going to jump on the little piggyback. The problem I had is just with the quote from the regulation, right? Directly related to the management or general business operations of the employer. So maybe you could answer. Go ahead. Take them both. Remember that it's clear now things like police officers would seem to me to be endemic to the quote business of the unit. They don't qualify. Probation officers, again, seem to be endemic to the business of the unit. They don't qualify. So maybe you can factor that all into your answer. Yes, your honors. I certainly think the learned professional exemption is a stronger argument. But I do believe there are duties done by these coordinators that fit with the administrative exemption. And that's particularly because legal and regulatory compliance is one of those areas that can be part of the business of the city. But what's the business of the unit? The business of the unit is to provide mental health resources and help to people who are in crisis. And one of the things that the coordinators do is to make sure that the city is complying with the Pennsylvania Mental Health Procedures Act. And that is a compliance issue, particularly with the 302 petitions. We think that that would fall within the administrative. And they certainly have a lot of discretion, which is part of what you need to show on the administrative exemption issue. You mentioned about lawyering. This is going back to learned professions. When I read some of this, going to your point, I was particularly struck by Jennifer Jubilee's testimony where she said a background and degree in psychology is very helpful. But it's on-the-job training that really gets you to be able to function effectively in the job. I thought of trial lawyers. I don't know how a law degree is that helpful to a trial lawyer. You have to get in and try cases over and over and over and over again. The degree might be helpful, gets you in the door. But once you're in the door, you got to know what you're doing. You don't learn that in law school. We do not argue or discount that on-the-job training was important here. But the FLSA cases are clear that on-the-job training doesn't take you outside of the exemption. So long as the professionalism and your education is part of the package. Of course there's going to be on-the-job training. As I said, just like being a lawyer. I didn't have a direct discovery from law school, but my time is up. Unless you have any questions. I want to understand something about the learned professional exemption. Your position before the district court was we should be granted summary judgment, learned professional exemption. Let's tell you all about it, and we're hoping for summary judgment. That didn't happen. You're here now. You've now pointed out to us that there are genuine disputes as a material fact. You're not requesting that on this record we look at this and say this is learned professional exemption. You're asking us to look at this record and say there are genuine disputes. It needs to go back and the case needs to be tried on this issue. Your Honor, actually we asked in the alternative. We do think that there's enough in the record that would show that the district court erred to properly take into consideration the high level of work that these coordinators were doing. And that on the plenary review your honors could in fact grant summary judgment on the learned professional exemption. That's what I don't understand. I thought you might say that, so now we've got some more questions. I don't know why this is crazy reverberation, but one of the positions you took below is look, look at the job description, requires master's degree. I'm not going to talk about the alternative that's within the job description. I'm just going to talk about the master's degree. Well, the district court said less than a majority of the coordinators, and there are 14, right? Yes. Less than a majority of the coordinators, and it's on page 23 of the opinion, less than a majority of the coordinators have master's degrees. Now, there's a document, A443, which is a listing of all 14, and it denotes what their educational backgrounds are. And on that document, 10 of the 14 have master's degrees. But as, so it's all over the place, right? You probably agree that if what I've just represented to you is so, that would be clearly erroneous, and that in and of itself, if you assume that's a material fact, would be problematic. But my overall point is, when you have disparate facts like that in the record, how could we possibly say, whether in the alternative or not, that a learned professional exemption should be applied, and yes, we should reverse the lower court and, in fact, grant you summary judgment? If you didn't really mean it, if you're just kind of protecting yourself, feel free to say so, which I got the feeling, you're really saying, look, it's summary judgment wasn't there, but there's not enough here for us to rule as a matter of law that you're entitled to the learned professional exemption. Yes, it was really more in the alternative and a protection thing. The CYA response. Yes. Okay. That's good. Then we're done. Thank you. All right. Thanks very much, Ms. Eldridge. Good morning, members of the panel. I'm Howard K. Trubin. I represent the appellees, cross-appellants.  They work as mental health coordinators. We are so familiar, so let's just get into the questions, okay? Would Your Honor like me to address, or would, I don't mean Your Honor, does the panel want me to address those questions that you asked distinguished defense counsel? We got our own questions for you. Okay. And my question first for you is, it really kind of goes to the brief. If I count them up right, there's 108 things that you claim are undisputed facts, but for at least 45 of them, there's no record citation, and they're kind of argumentative. And so my question is, isn't it kind of, you know, challenging when we're dealing with the Rule 56 summary judgment standard to say that there are no genuine issues of material fact, when indeed, even though they're not amongst the 108 that you've cited, there's a deposition and a declaration from Ms. Stuart Taylor, which says things which are completely contradictory to the things your clients have said. Well, but I believe that Judge Wilson decided, I mean, there's two district court judges in this case, I'm sure you know. Sure, and Judge Wilson was deciding a damages case on the basis of an already decided liability. And my question is going to the liability piece of this. If I read correctly from her deposition and deck, that she said a number of things that are contradictory about the number of calls, about the time it took, about the sophistication required, about the high level of discretion given to the people answering the phone. These were things that were, you know, very different. You started off by saying that there's like 4,300 calls to the 302 line. And she says, no, there's like 35,000 of them. That's like an eightfold difference. Isn't there in there a dispute of material fact that a fact finder has to sort out? Frankly, Your Honor, I don't believe so. Because the amount of phone calls is not that germane to either the professional or the administrative. What distinguished counsel for the defense didn't mention, is that to be exempted as a professional, you have to have had a course of specialized training. Doctors, lawyers, and then they have to take... Wouldn't a mental health professional? How about a, is a treating psychologist with a master's degree somebody with specialized training and knowledge? Well, the best... Yes. But I think the cases that are most relevant, one is from New York, one is from California. In the California case, which is I believe Levine, they said that they were not professionals. The same exact job as this, people calling on helplines to get people help as soon as possible. And this Levine case said they're not professionals, because they didn't have to take a state test, and they didn't follow a prolonged course of specialized treatment. In the New York case, the New York case said, and in the case itself it distinguished itself from the California case, he said in this case, these mental health professionals, if you want to call them that, of course that puts the rabbit in the hat, and he's used the word professional. But these people have to take a test, and they are state licensed. The people in California, the people in Philadelphia... Gotcha, Mr. Truman. Hold on, I've got a question. Here's the problem, I've got many questions, but here's the one that I'll start with. You say professional. Now, if there are 14 coordinators, you would agree with the proposition that since each of them at least has a college degree in a relevant area, they are professionals. No, Your Honor. Okay, great. How about the 10 of the 14 who have master's degrees in one of the chosen fields, psychology, sociology, etc.? Would you call them professional? I would say that what Judge Joyner said was perfect. Forget about Judge Joyner for the moment, with all due respect to that lovely jurist. I asked you if with a master's degree in the particular field, whether they would consider themselves professionals. They would consider themselves professionals. That's a different question, Your Honor. Well, that's the question I asked. So now let's focus on this. Judge Joyner, we'll now go back to Judge Joyner, said in his opinion that fewer than half of the coordinators had master's degrees. There is a document in the record listing the educational bona fides of each of the coordinators. It's A443, and it shows that 10 of the 14 have master's degrees. Now, the job description calls for a master's degree, so there's the job description. There's the fact that 10 of the 14 have master's degrees. There's the fact that, in the opinion, Judge Joyner says fewer than half have master's degrees. Now, the key question in all of this is what are the duties and what's required? Yes. So doesn't even that presentation of an error by the district court on the number of people who have master's degrees, the number of people who actually do have master's degrees, and the number of people who do have master's degrees? The job description, it says it calls for master's degrees. Doesn't all that create a genuine dispute as to what is required? Not what they're doing, but what is required for them to hold this position? I'm not sure I understand. Is the judge's question what the paper says they have master's degrees? Some of them had master's degrees in recreational therapy. Some were school teachers. But in terms of what they did, they did not do what's considered... Nobody had a master's degree in recreational, I'm so sorry, you said recreational therapy? I think it was Gregory Garner. He has a master's in community psychology. But the point is that there's clearly a genuine dispute as to what degrees they have, what's required. I don't agree with you, Your Honor. The cases indicate a prolonged list, a prolonged course of specialized instruction. That's very different, because that response would suggest it doesn't really matter. That's how you're going to answer the question, in fact. That would suggest that it doesn't really matter what the specific degree is, because the focus may well here be on the prolonged course of specific instruction on the job, as opposed to in the classroom. Well, that's not what the cases say. Are you suggesting that if they all had PhDs, that would be irrelevant? No. Because the educational requirement is meaningful, right? Yes, but it depends on what it's in. Okay. And here, it's not like give us a master's in some field that's irrelevant or so far over to the side from mental health that it's inapplicable. They're asking for master's degrees that are generally directly in or immediately adjacent to mental health, are they not? Yes, Your Honor, but the real answer is, and Judge Joyner caught it in his opinion, every single mental health coordinator whose deposition was taken, I don't think it was 14, I don't think they took the depositions of the three or four new ones, but every single one of those people testified that their educational, that their background in education didn't prepare them for the job. And they all said that they entirely learned the job on the job. Ms. Stewart-Taylor, well, let's just take another peek at Judge Joyner's opinion. He said that the plaintiffs generally defer to their supervisors. That's his language when talking about whether to issue a 302 warrant. That's directly contradicted by Ms. Stewart-Taylor. And Judge Joyner doesn't cite it. He doesn't acknowledge that it was ever said. But isn't that another instance of a fact which is disputed? The city's got evidence, it's got sworn evidence, from a supervisor who a jury would be entitled to credit. They could not believe her, they could believe your clients, but a jury could believe her. How can a summary judgment ruling stand when the court, the district court doesn't even acknowledge their supposing testimony? They only spoke to their supervisors when it was a unique situation. If they did the job for a year or two, there were patterns. Now you're making factual assertions. And our question to you isn't whether your factual assertions are better than their factual assertions. It is simply, is it not the case that there are two sets of factual assertions, and the district court not only didn't view these facts in the light most favorable to the non-movement, didn't even cite the non-movement's version of the facts, and held to the contrary, they generally defer? That's how he viewed it. That's the problem, right, Mr. Trubman? As a legal matter, under Rule 56C, that's what we have to confront under Rule 56, is he didn't acknowledge it, he saw it one way, but that's not the lens he was supposed to be using. Don't get me wrong, everybody up here loves Judge Joyner, excellent, excellent judge. Sorry that he decided to move on. But in this instance, just struggling with how you get to summary judgment when you've got evidence like Ms. Stewart-Taylor's, which appears to be pretty much in conflict with how your clients view themselves and what they did. There could be, but I don't think it's a material issue of fact as to determine whether they're professionals or not. Well, let's see whether this is an issue of fact. Now, you talked about the coordinators describing themselves, and let's just focus on one instance of that. So Ms. Davis in testimony says the job is very repetitive at Appendix 322, but almost in the same breath later on in the testimony, she talks about a very complex example of dealing with a mother having a psychotic breakdown while attempting to help her daughter, and her, number one, discerning that the mother was in stress or distress, I should say, and then making the call that they both, in fact, needed help, help, relief, I was trying to think of the correct medical term. Anyway, clearly that shows a dispute as to what really is at issue with regard to their primary duties. In part it may be answering the phone, which may be repetitive and somewhat rote, but in part it's the most sophisticated and difficult of issues, understanding and appreciating when someone calling about someone else is, in fact, in distress themselves. But they do not, the mental health coordinators, do not make a diagnosis. They do not have any follow-up. What their job is, simply, how do we get help? We get a mobile unit out or we have somebody bring them to a crisis center. They have nothing to do at all. There's no diagnosis. They do no canceling. The example I just gave you is diagnosis, because the mother was not calling about herself. The mother was calling about the daughter. My daughter needs help. And one of the coordinators, Ms. Davis, listening to it, says, oh, no, you need help as well, and then sent the appropriate persons to help the mother. That's diagnostic. That is not diagnostic, except for the, excuse me, Your Honor, it's diagnostic in the sense that they know that both of them need help. That's what the mental health coordinator's job is, to get people who are in mental distress help as soon as possible. It's not diagnostic to say, the mental health coordinator's not in a position to say they're psychotic or schizophrenic or any of those other things. On the contrary, the very point of issuing a 302 warrant is to say, this person appears to be so mentally ill that they need an evaluation and possible involuntary commitment. That certainly sounds like a person who's making an assessment about a mental illness. Your Honor, the 302 has four specific points. These people, after six months or a year, are familiar with them. They're not making a diagnosis in the sense we're talking about a medical diagnosis. Their diagnosis is, these individuals who need help fall within the parameters of the 302. Nothing else. I thought you were going to say that Ms. Davis, and I was surprised to read this, she described herself as a, she said, a magnified telephone operator, which surprised me given what she said she does, but that's what she described herself. Ms. Davis, who is in the courtroom, did testify to that because her job was basically routine. If there was any manual that they followed, it was the Mental Health Act. Well, you make the same argument about an orthopedic surgeon. I'm sorry. You make the same argument about an orthopedic surgeon. Very, very routine. All he or she does, depending on the specialty, is fix people's knees. Yes, but the orthopedic surgeon has gone through a prolonged course of specialized training. These people did not. Okay. A master's degree must come much easier in whatever focus period you're looking at. You know, master's degrees do not come easy. People work hard for them. Yes, but they were not, if you look at the, I'm sure you will, the CFRs are very specific about what's a professional. The employer has the burden of proving the exemption. We're with you on that, Mr. Truman. I'm not saying that we don't appreciate their arguments. We're just in the unusual position of maybe giving them more credit than they're giving themselves right now. Or at least indicating that the factual record could be read as giving them more credit than they're giving themselves. But we understand your argument. We've heard it. And we've got your briefing. We owe Ms. Eldridge five minutes, so we're going to give her that time. Thank you, Your Honor. Thank you, Your Honors. I had reserved five minutes primarily because I planned to respond to the cross-appeal, which didn't get raised on oral arguments. So do you want me to hear, do you want to hear anything on that? The opponent was not able to get to that part of his argument. Well, we had questions all about liability, so unless you feel like you've got something you need to add to your briefing, you can. I feel perfectly comfortable on the briefing we submitted on that, Your Honor. All right. Very good. Thank you.